[Cite as *McNeilan v. Ohio State Univ. Med. Ctr.*, 2009-Ohio-7027.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

RANDALL L. MCNEILAN, Exec.

    Plaintiff

    v.

OHIO STATE UNIVERSITY MEDICAL CENTER

    Defendant
    Case No. 2006-07449

Judge J. Craig Wright
Magistrate Lewis F. Pettigrew

<u>MAGISTRATE DECISION</u>

{¶ 1} Plaintiff brings this action on behalf of the estate of the decedent, Harley Nutt, alleging wrongful death. Plaintiff asserts that Mr. Nutt died as a result of peritonitis on January 31, 2004, several days after he underwent heart bypass and aortic valve replacement (AVR) surgery. According to plaintiff, the peritonitis was caused by impaired blood flow to an area of the small intestine that resulted in perforation and leakage of bowel contents into the abdominal cavity. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} Mr. Nutt was diagnosed with mouth and throat cancer for which he underwent surgical resection in 2003. The cancer recurred and, prior to undergoing additional surgery, Mr. Nutt was referred to Dr. Michler for a cardiac evaluation. Dr. Michler determined that Mr. Nutt had severe coronary artery disease for which he recommended heart bypass surgery. The surgery took place on Friday, January 23, 2004.

{¶ 3} The decedent's daughter, Tonya Sartin, testified that she received a phone call from Dr. Michler from the operating room notifying her that her father would also need to have an AVR performed. After she gave verbal consent for the additional procedure, the surgery commenced. Mr. Nutt came out of surgery in the early afternoon and was then transferred to the Surgical Intensive Care Unit. Tonya testified that her father was talking to her that night. Mr. Nutt was returned to a regular room on Saturday afternoon. Tonya recalled that he ate ice cream and drank some milk. On Sunday, he ambulated in the hallway with assistance but when he complained of dizziness, he was allowed to rest in a chair. Tonya testified that her father ate mostly soft foods that day and that he spent much of the day sleeping.

{¶ 4} On Monday, Mr. Nutt was discharged to home with the understanding that his family members would assist with his care. According to Tonya, her father slept most of Monday, only arising to walk to the bathroom and then return to bed. On Tuesday morning he complained that he was not feeling well and he started vomiting. The family members called the emergency squad and the paramedics came and evaluated Mr. Nutt. Mr. Nutt was not transported to the hospital at that time. Tonya recalled that later that same day Mr. Nutt ate cottage cheese, mashed potatoes, and that he drank some milk.

{¶ 5} Tonya stated that early on Wednesday morning she called into Dr. Michler's office and talked with a physician's assistant about the ongoing vomiting. She testified that he replied that the vomiting could be a side effect of the pain medication. She also stated that she does not recall being told to bring her father to the office or to the emergency room if his symptoms worsened. Mr. Nutt was seen and examined on Wednesday by a home health nurse who noted that he was "vomiting thin bright green emesis." (Joint Exhibit A, Tab 41, Med. Rec. No. 0227.) According to Tonya, the vomiting continued off and on through Wednesday.

{¶ 6}   On Thursday, Mr. Nutt was visited by a home health physical therapy aide. Tonya recalled that her father was rather weak and that the physical therapist told her that he would return the next week to begin therapy for Mr. Nutt.  Tonya recalled that the vomiting tapered off to 2-3 times per day on Thursday and Friday and that Mr. Nutt seemed to rally a bit and enjoy the company of a few visitors.

{¶ 7}   On Friday afternoon, Mr. Nutt had another visit by a home health nurse. She examined him and noted the history of vomiting.  The nurse determined that Mr. Nutt had bowel sounds that she characterized as "sluggish."  The nurse called in to Dr. Michler's office and received an order for a laxative to be administered.  (Joint Exhibit A, Tab 41, Med. Rec. No. 0256.)

{¶ 8}   According to Tonya, Mr. Nutt's condition began to worsen later on Friday. She  recalled that her father was lying in bed curled on his side, and that he used the bathroom several times through the night.   By early Saturday morning, Mr. Nutt was writhing in the bed and complaining of severe abdominal pain.  He requested that Tonya call an ambulance.  The paramedics arrived at approximately 9:10 a.m. and noted that Mr. Nutt had an extremely low blood pressure and that he seemed quite ill.   The paramedics were unable to secure intravenous access despite several attempts. They loaded Mr. Nutt into the ambulance and drove him to defendant's emergency room. (Joint Exhibit A, Tab 42, Med. Rec. No. 0260-1.)   While en route Mr. Nutt suffered cardiac and respiratory arrest.  (Joint Exhibit A, Tab 42.)

{¶ 9}   Plaintiff maintains that Dr. Michler's decision to discharge Mr. Nutt three days after open heart surgery (OHS) fell below the standard of care.  In addition, plaintiff contends that Dr. Michler was negligent in that he failed to properly respond to the decedent's complaints of persistent vomiting and failed to recognize signs of an abdominal infection.  Plaintiff argues that Dr. Michler's failure to timely diagnose an intestinal perforation and subsequent infectious process was also a proximate cause of Mr. Nutt's death.

{¶ 10} "In order to establish medical [negligence], it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 131.

{¶ 11} "To maintain a wrongful death action on a theory of medical negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 92, citing *Bennison v. Stillpass Transit Co.* (1966), 5 Ohio St.2d 122, paragraph one of the syllabus.

{¶ 12} Plaintiff's expert, Dr. Balke, testified that he is a professor of medicine and physiology in the Department of Internal Medicine and the Department of Physiology at the University of Kentucky (UK).[1] In the clinical setting, he is responsible for the patients in the cardiac intensive care unit. Dr. Balke stated that, in his opinion, Dr. Michler did not meet the standard of care when he discharged Mr. Nutt three days after OHS. He opined that, in his experience, the standard of care is met when such patients are discharged no earlier than the fifth to the seventh postoperative day. Dr. Balke noted that Mr. Nutt had some difficulty ambulating and that he had complained of abdominal distention prior to discharge. He admitted that, although abdominal distention is not necessarily a contraindication to discharge, Mr. Nutt's elevated white

---

[1]Upon cross-examination, Dr. Balke acknowledged that, in addition to providing patient care, he has several administrative and research positions at UK. Dr. Balke then clarified that while 50 percent of his time is spent in clinical practice and instruction, only 30 percent of his time is spent in the active clinical practice of medicine.

blood cell count could have been an indication of an infectious process developing. Nonetheless, upon cross-examination, Dr. Balke acknowledged that the white blood cell count on the day of discharge was the same as the level recorded prior to the OHS. According to Dr. Balke, the medical records also document that Mr. Nutt's blood pressure readings were variable and that his oxygen saturation levels were low during the 12-hour period prior to discharge. During direct examination, however, Dr. Balke admitted that Dr. Michler's failure to meet the standard of care in regard to the timing of Mr. Nutt's discharge was not a proximate cause of his death.

{¶ 13} Dr. Balke further opined that Dr. Michler did not meet the standard of care in that he failed to recognize and act upon signs of escalating intestinal tract problems exhibited by Mr. Nutt on Wednesday January 28 (the phone call to Dr. Michler's office from Mr. Nutt's family) and Friday January 30 (the call from the home health nurse regarding an order for a laxative due to sluggish bowel sounds). According to Dr. Balke, as the intestinal tissue dies from the lack of adequate blood flow, a patient typically exhibits symptoms of intestinal distress including nausea and vomiting. He explained that such ischemic damage may be present for several days prior to perforation during which time the walls of the intestine continue to weaken. Thus, Dr. Balke opined that had Dr. Michler identified the presence of ischemic bowel and instituted appropriate treatment, Mr. Nutt had a better than 50 percent chance for survival.

{¶ 14} Upon cross-examination, however, Dr. Balke conceded that it is impossible to state with any certainty when, in the course of events, that the perforation occurred. Dr. Balke also acknowledged that a disruption of blood flow to an organ during OHS is a known complication of the procedure. Dr. Balke had no criticism of the care rendered to Mr. Nutt by any of defendant's employees other than Dr. Michler.

{¶ 15} Dr. Michler testified that the surgery went well and that Mr. Nutt progressed as expected while he was inpatient. He opined that the standard of care permits discharge of OHS patients three days after surgery provided the patient meets certain criteria. In reviewing the medical records, Dr. Michler determined that Mr. Nutt

met the criteria prior to his discharge to home.  Specifically, Dr. Michler assessed Mr. Nutt's vital signs, his ability to ambulate, and his ability to eliminate via bowel and bladder.  He noted that Mr. Nutt's ability to eat was limited due to the previous oral surgeries and that he accounted for this when assessing Mr. Nutt's intake.  Although Mr. Nutt's oxygen saturation levels varied from 89 to 92 percent in the hours prior to discharge, Dr. Michler noted that the levels were not unusual for a patient with a longstanding history of cigarette smoking and that Mr. Nutt did not complain of shortness of breath.  In reviewing the laboratory values, Dr. Michler explained that Mr. Nutt had the same white and red blood count as when he was admitted and that the levels were normal for Mr. Nutt.  He attributed the elevated coagulation levels to the administration of Heparin, a blood-thinning medication, used during OHS.   According to Dr. Michler, Mr. Nutt's other laboratory values were consistent with those expected of a recovering OHS patient.

{¶ 16} Dr. Michler testified that it was within the standard of care to advise Mr. Nutt's family that the nausea and vomiting could be a side effect or a reaction to the pain medicine.  Dr. Michler also testified that it was within the standard of care to order laxatives post-operatively inasmuch as decreased intestinal activity was common after surgery and could also be a side effect of the narcotic pain medicine.  He added that Mr. Nutt was approximately five feet, nine inches tall; that he weighed over 200 pounds; and that his abdomen was described as large, rounded, with hypoactive or sluggish bowel sounds.

{¶ 17} According to the autopsy findings, Mr. Nutt suffered an ischemic injury[2] to the lower segment of his jejunum, an area located in the small intestine.  The autopsy record identified an 18-centimeter (cm) section of small bowel exhibiting signs of

---

[2]Dr. Michler explained that ischemia means decreased or interrupted blood flow to an area of otherwise healthy tissue.

ischemic injury and a perforation of the nearby area measuring approximately 3 cm. (Joint Exhibit A, Tab 45, Med. Rec. No. 0284.)[3]

{¶ 18} Dr. Michler maintained that discharge of a patient with OHS and AVR after three days was within the standard of care. Dr. Michler testified that ischemic injury to the bowel is a rare but known complication of OHS. According to Dr. Michler's review of the records, there was no indication of an impending catastrophic event prior to discharge or during the initial postoperative period at home. Dr. Michler believed that the timing of Mr. Nutt's discharge had nothing to do with his demise. According to Dr. Michler, a precipitous event most likely occurred late on Friday, January 30, and that such event led to Mr. Nutt's death. He testified that an ischemic injury is difficult to diagnose, that it is difficult to treat, and that it can be fatal. Indeed, Dr. Michler opined that even if Mr. Nutt had remained in the hospital the entire week, there is no guarantee that he would have survived the complications brought on by the perforation. He also emphasized that Mr. Nutt was seen every day after discharge by at least one health-care provider and that the opportunity to consult with a physician was also available to Mr. Nutt and his family.

{¶ 19} Defendant's expert cardiothoracic surgeon, Dr. Murphy, testified that Mr. Nutt met the criteria for discharge three days after surgery. He noted that the medical records document that Mr. Nutt was eating, and that he had been up to use the bathroom, had been up to sit in a chair, and that he had ambulated with assistance for some distance in the hallway. In addition, Dr. Murphy testified that Mr. Nutt's vital signs were within a normal range and that his oxygen saturation level was acceptable for a patient with Mr. Nutt's history. Dr. Murphy opined that there was no deviation from the standard of care with respect to the treatment provided to Mr. Nutt either by Dr. Michler or by any other employee of defendant. Dr. Murphy stated that the home health nurses' notes do not suggest that Mr. Nutt exhibited signs of perforation or of acute peritonitis.

---

[3]The autopsy findings also document that the heart bypass grafts and the aortic valve were intact

He explained that peritonitis causes extreme pain, that the abdomen becomes rigid, and that bowel sounds are absent. In Dr. Murphy's opinion, based in part upon his review of the medical records, Mr. Nutt suffered an acute intestinal perforation and acute peritonitis on Saturday. Dr. Murphy characterized the event as an abdominal catastrophe that resulted in Mr. Nutt's death.

{¶ 20} Dr. Nussbaum, defendant's expert general surgeon, testified via videotape deposition that he performs primarily gastrointestinal procedures. He opined that the medical treatment provided to Mr. Nutt by Dr. Michler was within the standard of care. Specifically, he agreed that Mr. Nutt met the criteria necessary for discharge and that the timing of his discharge also was within the recognized standard of care for the community. In addition, Dr. Nussbaum opined that Dr. Michler responded appropriately to Mr. Nutt's complaints of nausea and constipation as they were reported to him. Dr. Nussbaum stated that complaints of nausea and vomiting are very common even three to four days after surgery. According to Dr. Nussbaum, the intestinal injury suffered by Mr. Nutt most likely occurred as a result of low or diminished blood flow to the area during and possibly after the OHS. He opined that such event is a known but rare complication of OHS. He also testified that bowel ischemia is difficult to diagnose; that once the perforation occurs, a patient will experience sudden, profound abdominal pain, and that death can occur within a very short period of time.

{¶ 21} After careful consideration of the testimony and evidence adduced at trial, the court finds that at all times Dr. Michler's care and treatment of plaintiff's decedent did not fall below the standard of care. Specifically, the court finds that Mr. Nutt's vital signs, oxygen saturation levels, ability to ambulate, and his bowel and bladder functions met the criteria for discharge on January 26, 2004, especially for a patient with Mr. Nutt's medical and postsurgical conditions. The court further finds that the timing of Mr. Nutt's discharge was not proximately related to the ischemic injury and subsequent

without evidence of leakage at the anastomoses sites. (Joint Exhibit A, Tab 46, Med. Rec. No. 0284.)

perforation that led to Mr. Nutt's demise.  In addition, the court finds that the testimony of Dr. Murphy and Dr. Nussbaum was more persuasive than the opinions offered by Dr. Balke, especially in reference to assessing and responding to Mr. Nutt's complaints of postoperative nausea, vomiting and constipation.  As such, the court finds that the manner of Dr. Michler's care and treatment of Mr. Nutt from January 26 through January 31, 2004, did not fall below the standard of care.

{¶ 22} Based upon the totality of the evidence, the court finds that plaintiff has failed to prove his claim by a preponderance of the evidence.  Accordingly, it is recommended that judgment be rendered in favor of defendant.

*A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i).  If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed.  A party shall not assign as error on appeal the court's adoption of any factual finding or legal*

*conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
LEWIS F. PETTIGREW
Magistrate


cc:

Leigh-Ann M. Sims
6734 Royal Plume Drive
Dublin, Ohio 43016

Timothy T. Tullis
Traci A. McGuire
Special Counsel to Attorney General
Capitol Square Office Building
65 East State Street, Suite 1800
Columbus, Ohio 43215-4294

SJM/cmd
Filed November 23, 2009
To S.C. reporter December 29, 2009